JS-6

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 14-01425 JGB (KKx)** | Date | July 13, 2015 |
|---|---|---|---|
| Title | ***Nanci Quintana Gomez v. Guthy-Renker, LLC*** | | |

Present: The Honorable   JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:    Order GRANTING Defendant's Motion to Dismiss (Doc. No. 32) (IN CHAMBERS)**

Before the Court is Defendant's motion to dismiss Plaintiff's First Amended Complaint. (Doc. No. 32.) After considering the materials submitted by the parties, the Court GRANTS the motion. Plaintiff's First Amended Complaint is dismissed without leave to amend.

## I. BACKGROUND

On July 11, 2014, Plaintiff Nanci Quintana Gomez ("Plaintiff") filed the present action against Guthy-Renker, LLC ("Defendant"). (Doc. No. 1.) On February 12, 2015, Defendant filed a motion to dismiss Plaintiff's Complaint. (Doc. No. 27.) Plaintiff mooted this motion by filing a First Amended Complaint ("FAC") on March 5, 2015. (Doc. No. 29.) Defendant withdrew the motion and submitted a motion to dismiss the FAC, which is now before the Court. (Doc. No. 32 ("MTD"); Doc. No. 33 ("Opp'n"); Doc. No. 36 ("Reply").)

## II.    Allegations in the FAC

### A.    Defendant's Business

The pertinent factual allegations, which the Court accepts as true for purposes of this motion, are as follows:

Defendant engages in a business selling various consumer products in the beauty, skincare, entertainment, and wellness categories (for example, Proactiv, a line of acne cleansing and skin care products). (FAC ¶¶ 19, 20.) It markets these products through various media, accepts orders from customers online and by phone, and then ships the products to its customers. (FAC ¶¶ 19,

21.) When first-time purchasers order Defendant's product, they are enrolled in a "continuity program," wherein Defendant bills the purchaser and sends an initial supply, then periodically sends more of the product and bills the purchaser again using the same payment information. (FAC ¶ 21, 22.) This "continuity program" continues until the purchaser calls to cancel. (FAC ¶ 21.) As explained on Defendant's various websites, the "continuity program" means:

> Starting 30 days from your order date, you'll receive a new 90-day supply of our [Products] every 3 months at the guaranteed price of [$XX.XX] plus [$X.XX] shipping and handling per month, which will conveniently be charged to the card you provide today unless you call to cancel. There is no commitment and no minimum to buy. To customize this program or future shipments and charges, call customer service at [1-800-XXX-XXXX].

(FAC ¶ 22 (emphasis added).)

Plaintiff alleges that this "continuity program" is "a scheme to use customer payment card information to charge for, and collect, unauthorized and forbidden amounts from customers' accounts with banks and financial institutions." (FAC ¶ 128.) The unauthorized charges alleged by Plaintiff fall into three categories:

1. **Charges made where the customer never approved the continuity program in writing.**
   Unlike internet customers, who are required to check a box agreeing to the continuity program as described above, phone customers never give explicit written consent to be enrolled in the continuity program. (FAC ¶ 25, 66, 99.) When the first shipment arrives, it includes an invoice informing the customer that she has been enrolled in the program and that it will continue until cancelled. (FAC ¶ 26, 66.) Thus, for these customers, Plaintiff alleges that any charges made after the initial purchase are unauthorized.

2. **Charges made after the customer requested cancellation of the continuity program.**
   Plaintiff alleges that Defendant routinely fails to effectuate cancellation requests from customers, despite agreeing to do so. (See, e.g., FAC ¶¶ 88-95, 100-103.) Thus, for these customers, Plaintiff alleges that any charges made after the cancellation request are unauthorized.

3. **Charges made more frequently under the continuity program than the customer expected.**
   Defendant refers to its product quantities in terms of "30-day supply" and "90-day supply," but refers to its billing cycle in terms of "per month" and "every three months." (FAC ¶¶ 4, 21, 22, 22 n.5, 26, 26 n.6.) Apparently hoping to capitalize on the ambiguity in the term "per month,"[1] Defendant treats "month" as meaning "28-

---

[1] Does it mean "per calendar month" or "per month-long period"? And if it means "per month-long period," the length of which month?

day period" for its billing practices. (FAC ¶ 4, 67.) Thus, when agreeing to participate in the "continuity program," customers believe the program's billing period to be every calendar month, or perhaps every 30-day period (to match the supply), but instead are subjected to a billing period of 28 days. Thus, Plaintiff alleges, any charges made more frequently than every calendar month (or perhaps every 30-day period)[2] are unauthorized.

## B.   Third Party Vendors

Unsurprisingly, in the course of doing business, Defendant transacts with other companies for the performance of various routine services. (FAC ¶ 11.)

In order to accept payment by credit and debit card, Defendant uses a servicer called Litle & Co, LLC. (FAC ¶ 32.) Litle & Co contracts with Wells Fargo Bank NA and Fifth Third Bank in order to provide this service because only banks are able to participate directly in electronic payment networks such as Visa and MasterCard. (FAC ¶¶ 29, 30 n.7, 32.) Defendant also uses a third party company called EDS (a Hewlett Packard company also known as "HP Enterprise Services") to facilitate its submission of transactions to Litle & Co. (FAC ¶ 48, 54.) These entities—the Court will refer to them collectively as the "payment processors"—process credit and debit card transactions in exchange for "an agreed upon processing fee." (FAC ¶ 30.) "Every merchant using these payment networks submits transactions and obtains payments in this same way." (FAC ¶ 31.)

Defendant also contracts with other companies to provide various customer service operations, such as running and staffing a customer service call center. (FAC ¶ 54.) During the relevant time period, Defendant contracted with numerous third-party companies to handle customer service calls. (Id.) The Court will refer to them collectively as the "customer service companies."

## III.   LEGAL STANDARD

### A.   Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(6) allows a party to bring a motion to dismiss for failure to state a claim upon which relief can be granted. Rule 12(b)(6) is read in conjunction with Rule 8(a), which requires only a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2); Conley v. Gibson, 355 U.S. 41, 47 (1957) (holding that the Federal Rules require that a plaintiff provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests") (quoting Fed. R. Civ. P. 8(a)(2)); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). When evaluating a Rule 12(b)(6) motion, a court must accept all material allegations in the complaint — as well as any reasonable inferences to be drawn from them — as true and construe them in the light most favorable to the non-moving party. See Doe v. United States, 419

---

[2] Plaintiff does not actually state which of these two "per month" billing periods she believed she was agreeing to.

F.3d 1058, 1062 (9th Cir. 2005); <u>ARC Ecology v. U.S. Dep't of Air Force</u>, 411 F.3d 1092, 1096 (9th Cir. 2005); <u>Moyo v. Gomez</u>, 32 F.3d 1382, 1384 (9th Cir. 1994).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." <u>Twombly</u>, 550 U.S. at 555 (citations omitted). Rather, the allegations in the complaint "must be enough to raise a right to relief above the speculative level." <u>Id.</u>

Surviving a motion to dismiss requires a plaintiff to allege "enough facts to state a claim to relief that is plausible on its face." <u>Twombly</u>, 550 U.S. at 570; <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 697 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'" <u>Iqbal</u>, 556 U.S. at 678 (quoting <u>Twombly</u>, 550 U.S. at 556). The Ninth Circuit has clarified that (1) a complaint must "contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively," and (2) "the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." <u>Starr v. Baca</u>, 652 F.3d 1202, 1216 (9th Cir. 2011).

Although the scope of review is limited to the contents of the complaint, the Court may also consider exhibits submitted with the complaint, <u>Hal Roach Studios, Inc. v. Richard Feiner & Co.</u>, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990), and "take judicial notice of matters of public record outside the pleadings," <u>Mir v. Little Co. of Mary Hosp.</u>, 844 F.2d 646, 649 (9th Cir. 1988).

**B.   RICO Liability**

Plaintiff alleges that Defendant's actions constitute racketeering under 18 U.S.C. § 1962(c). which makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c).

Accordingly, four elements are necessary. Plaintiff must plead:

(1) conduct

(2) of an enterprise

(3) through a pattern

(4) of racketeering activity.

<u>Sedima, S.P.R.L. v. Imrex Co.</u>, 473 U.S. 479, 496 (1985); <u>Eclectic Properties E., LLC v. Marcus & Millichap Co.</u>, 751 F.3d 990, 997 (9th Cir. 2014).

For purposes of construing these elements, "RICO is to be read broadly . . . [and] is to be liberally construed to effectuate its remedial purposes." <u>Sedima, S.P.R.L. v. Imrex Co.</u>, 473 U.S. 479, 497-98 (1985). Each of these four elements are discussed below. They have been reordered to better suit the order of analysis.

### 1. Enterprise

The Defendant must be employed by or associated with an "enterprise." 18 U.S.C. § 1962(c). The enterprise must be a distinct entity from Defendant, "not simply the same 'person' referred to by a different name." <u>Cedric Kushner Promotions, Ltd. v. King</u>, 533 U.S. 158 (2001).

"Section 1961(4) describes two categories of associations that come within the purview of the 'enterprise' definition. The first encompasses organizations such as corporations and partnerships, and other 'legal entities.' The second covers 'any union or group of individuals associated in fact although not a legal entity.'" <u>United States v. Turkette</u>, 452 U.S. 576, 581-82 (1981) (citing 18 U.S.C. § 1961(4)). Plaintiff alleges that Defendant is associated with the second category of enterprise, a so-called "associated-in-fact" enterprise.

An "association-in-fact enterprise is 'a group of persons associated together for a common purpose of engaging in a course of conduct.'" <u>Boyle v. U.S.</u>, 556 U.S. 938, 946 (2009). "Such an enterprise . . . is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." <u>Id.</u> at 945. Furthermore, "an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." <u>Id.</u> at 945.

> That an "enterprise" must have a purpose is apparent from meaning of the term in ordinary usage, i.e., a "venture," "undertaking," or "project." The concept of "associat[ion]" requires both interpersonal relationships and a common interest. Section 1962(c) reinforces this conclusion and also shows that an "enterprise" must have some longevity, since the offense proscribed by that provision demands proof that the enterprise had "affairs" of sufficient duration to permit an associate to "participate" in those affairs through "a pattern of racketeering activity."

<u>Id.</u> at 946 (internal citations omitted).

### 2. Conduct

The Defendant must "conduct or participate, directly or indirectly, in the conduct of [the] enterprise's affairs." 18 U.S.C. § 1962(c). "Conduct" here means more than mere participation in the enterprise's affairs. RICO liability only attaches to "those who participate in the operation or management of an enterprise through a pattern of racketeering activity." <u>Reves v. Ernst & Young</u>, 507 U.S. 170, 184 (1993). Thus, in order for this element to be met, "one must have some part in directing [the enterprise's] affairs." <u>Id.</u> at 179.

And, just as Defendant and the enterprise must be "two distinct entities," RICO liability also "depends on showing that the defendants conducted or participated in the conduct of the

'enterprise's affairs,' not just their <u>own</u> affairs." <u>Cedric Kushner Promotions, Ltd. v. King</u>, 533 U.S. 158, 163 (2001) (emphasis in original).

### 3. Racketeering

Racketeering activity requires commission of one of the predicate acts enumerated in 18 U.S.C. § 1961(1). In this case the alleged predicate acts are alleged to be mail and wire fraud under 18 U.S.C. §§ 1341 and 1343, as well as bank fraud under 18 U.S.C. § 1344.

"The mail and wire fraud statutes are identical except for the particular method used to disseminate the fraud, and contain three elements: (A) the formation of a scheme to defraud, (B) the use of the mails or wires in furtherance of that scheme, and (C) the specific intent to defraud." <u>Eclectic Properties E., LLC v. Marcus & Millichap Co.</u>, 751 F.3d 990, 997 (9th Cir. 2014).

Bank fraud under 18 U.S.C. § 1344 comes in two forms. <u>Compare</u> 18 U.S.C. § 1344(1) <u>with</u> 18 U.S.C. § 1344(2); <u>see</u> <u>United States v. Shaw</u>, 781 F.3d 1130, 1134 (9th Cir. 2015) ("[W]hile they overlap substantially, the clauses are disjunctive and establish distinct offenses."). "Section 1344(2) targets schemes to obtain property held by the bank via misrepresentation to a third party, while § 1344(1) penalizes schemes to defraud the bank itself." <u>Id.</u>

### 4. Pattern

A "'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). Defendant does not challenge this element.

## IV.    DISCUSSION

### A.    Plaintiff's pleading strategy is an attempt to transform a standard fraud claim into a RICO claim.

While the facts alleged in this case are unique—as are the facts in every case—the legal issue raised by them has already been faced by numerous courts: can a defendant accused of fraud be subjected to RICO liability simply on the basis of receiving routine commercial services from some other entity? A typical alleged fact pattern is as follows:

> Some provider of services[3] ("Provider") has a business client ("Business"). Completely unbeknownst to Provider, Business is conducting its affairs fraudulently.[4] Someone[5] ("Injured Party") is

---

[3] For example, advertising services, payment processing services, etc.

[4] Or in some other manner that constitutes a pattern of racketeering.

[5] This could be Provider or some separate person, such as a consumer.

injured by Business's fraudulent practices and wishes to seek compensation from Business.

Whatever the merits of Injured Party's ("IP") potential fraud claim against Business, IP has good reasons for preferring to bring a civil RICO claim against Business. For instance, civil RICO provides for treble damages. <u>Odom v. Microsoft Corp.</u>, 486 F.3d 541, 545 (9th Cir. 2007) (<u>en banc</u>). But in order to assert a RICO claim against Business, IP must plead the existence of an "enterprise."

Of course, Business itself is an enterprise. However, IP cannot plead Business as the enterprise because it is barred by the requirement that the enterprise must be a distinct entity from Business, "not simply the same 'person' referred to by a different name." <u>Cedric Kushner Promotions, Ltd. v. King</u>, 533 U.S. 158 (2001).

But an enterprising plaintiff such as IP need not be thwarted by this doctrine. IP knows that Business, like every other modern enterprise, cannot function in the commercial world without receiving at least some services from another entity, be it payment processing, advertising, or even simply an internet connection. Any such service provider would constitute be a separate enterprise in fulfillment of the 'distinctness' requirement. Thus, if IP wants to bring a RICO claim against Business, it can simply add Provider to its allegations.

Of course, this is not quite enough. RICO requires that Business "participate in the operation or management" of the enterprise. <u>Reves v. Ernst & Young</u>, 507 U.S. 170, 184 (1993). Since Business is merely a consumer of Provider's services, Business cannot be said to participate in the operation or management of Provider. Even with these allegations, IP cannot seem to meet the requirements of a RICO claim.

But if IP has retained sufficiently crafty counsel, the harsh reality of the situation need not serve as a barrier to RICO litigation. As is well known, the <u>sine qua non</u> of the legal profession is the circumvention of reality through creative wordplay. Whatever facts reality fails to supply can be replaced with creative pleading.

Based solely on the facts above, and some creative elaboration, IP can posit the existence of a <u>new</u> "associated-in-fact" enterprise, consisting of the "union or group" of Business and Provider. To do this, IP need merely elaborate on what it means for Provider to provide services to Business, doing so in a way that expresses their "(A) a common purpose, (B) a structure or organization, and (C) longevity necessary to accomplish the purpose." <u>Eclectic Properties E., LLC v. Marcus & Millichap Co.</u>, 751 F.3d 990, 997 (9th Cir. 2014). This is a trivial task for the seasoned and zealous advocate.

Finding a "common purpose" can be done relatively systematically. Since Provider and Business are in a commercial relationship, their commercial relationship need only be restated as a "purpose." In other words, the "common purpose" is whatever service Provider is performing for Business.

Finding the "structure and organization" between Provider and Business requires some creativity, but can be done by elaborating on their relationship as a provider of services and a

consumer of services in terms of the formalities—contractual or otherwise—that govern that relationship.

Finding the "longevity necessary to accomplish the purpose" is trivial. Since the new "enterprise" has been defined by the original entities' "common purpose," the enterprise lasts <u>exactly</u> as long as the common purpose. Thus, the "longevity" requirement cannot fail to be met under this creative pleading strategy.

Using this pleading strategy, IP's counsel can construct a novel "enterprise" out of nothing more than the allegation that Provider provides services to Business; it just requires elaborating verbosely on what a Servicer/Client relationship means. Once this "enterprise" is constructed out of a routine commercial relationship, no additional facts are necessary to establish that Business has "some part in directing [that enterprise's] affairs" in satisfaction of RICO's "conduct" requirement. <u>Reves v. Ernst & Young</u>, 507 U.S. 170, 179 (1993). The "enterprise" is really nothing more than a Servicer/Client relationship and its affairs are nothing more than the services being provided. So Business necessarily plays some role in directing the services it receives from Provider: Provider provides the services Business wants or else Business finds a new provider.

Finally, as long as these services played some role in Business's fraudulent affairs, then IP can tie the affairs of the enterprise to Business's pattern of racketeering activity.

Thus, with some creative pleading, IP can (purport to) allege a RICO violation based on nothing more than (1) an allegation of Business's pattern of racketeering and (2) an allegation that Business received services from Provider. The rest requires no new substantive allegations, but merely creative elaboration on the first two.

Once IP brings this RICO claim against Business, some court will be tasked with determining whether this creative pleading strategy is legally sufficient. This is the position the Court finds itself in, facing the current motion.

 **B. <u>Friedman v. 24 Hour Fitness</u> found a RICO violation on similar facts, but other courts have disagreed with <u>Friedman</u>.**

At least one district court has credited this pleading strategy, and did so on facts very similar to the present case. In <u>Friedman v. 24 Hour Fitness USA, Inc.</u>, 580 F. Supp. 2d 985 (C.D. Cal. 2008), the defendant, an operator of fitness centers, was accused of "wire fraud and bank fraud in a manner rising to 'an ongoing pattern of racketeering activity.'" <u>Id.</u> at 989. As here, the plaintiff alleged that the defendant "wrongly charged additional dues after cancellation." <u>Id.</u>  And, as here, the defendant in <u>Friedman</u> relied on "outside payment processing companies" in conducting its affairs. <u>Id.</u>

The <u>Friedman</u> plaintiff alleged that the defendant, along with its payment processors, formed an associated-in-fact enterprise. To support this allegation, the plaintiff employed a strategy very similar to the one described above. The Court found that the plaintiff had sufficiently pleaded a RICO enterprise. <u>Id.</u> at 990.

With respect to the "common purpose" requirement, the Court concluded that the "entities' common purpose was simply to effectuate EFT payments." <u>Id.</u> at 991. The Court found an

"ongoing organization and continuing unit" based on "the mechanisms that Defendant and its payment processors set up to effectuate monthly withdrawal of dues from consumers' bank and credit card accounts." Id. at 993. And the "longevity" requirement was met because "these mechanisms have been in operation since 1999." Id. at 993. And finally, the enterprise was "controlled, managed and directed by" the defendant because the defendant "issue[d] instructions to the payment processors." Id. at 989.

Defendant attempts to distinguish Friedman, but the Court is unpersuaded that the factual distinctions cited by Defendant have any bearing on the legal issue. (See MTD at 17.) Accordingly, the Court declines to rely on these distinctions in deciding the motion. However, as Defendant points out, Friedman is not binding precedent and other courts addressing the same issue on similar facts have expressly declined to follow Friedman. (Id. at 15-17.) Accordingly, due to the disagreement among courts regarding this pleading strategy, the Court concludes that the issue cannot be decided on the persuasive authority of Friedman alone. An independent analysis is needed.

## C.   Plaintiff's argument proves too much and would entail an expansion of RICO far beyond Congress's intent.

Congress has directed "that the 'provisions of [RICO] shall be liberally construed to effectuate its remedial purposes.' This clause obviously seeks to ensure that Congress' intent is not frustrated by an overly narrow reading of the statute, but it is not an invitation to apply RICO to new purposes that Congress never intended." Reves v. Ernst & Young, 507 U.S. 170, 183 (1993). As explained below, crediting the kind of pleading strategy employed by Plaintiff would lead to exactly such unintended expansion.

### 1. Congress did not intend a pattern of racketeering alone to subject an individual to RICO liability.

In Reves v. Ernst & Young, 507 U.S. 170 (1993), the Supreme Court discussed what could be gleaned about RICO's intended scope from its legislative history, pointing out that "while [RICO] was being considered, critics of the bill raised concerns that racketeering activity was defined so broadly." Id. at 183. "The bar committee complain[ed] that the list [of predicate crimes] is too inclusive, since it would include offenses which often are committed by persons not engaged in organized crime." 116 Cong. Rec. 18940 (1970) (remarks of Sen. McClellan).

Senator McClellan reassured the bill's critics that the critical limitation was not to be found in § 1961(1)'s list of predicate crimes but in the statute's other requirements, including those of § 1962:

"The danger that commission of such offenses by other individuals would subject them to proceedings under [RICO] is even smaller than any such danger under [the Safe Streets Act], since commission of a crime listed under [§ 1961(1)] provides only one element of [RICO's] prohibitions. Unless an individual not only commits such a crime but engages in a pattern of such violations, and uses that pattern to obtain

> or operate an interest in an interstate business, he is not made subject to
> proceedings under [RICO]."

> Reves, 507 U.S. at 183 (emphasis added).

As Senator McClellan comments, quoted in Reves, makes clear, RICO liability requires more than a pattern of § 1961(1) predicate crimes.

### 2. Accepting Plaintiff's pleading strategy would render an individual's pattern of racketeering sufficient for RICO liability.

Because RICO liability requires more than a pattern of § 1961(1) predicate crimes, any interpretation of RICO that would render such a pattern sufficient for RICO liability would clearly expand the statute beyond the applications intended by Congress and beyond the scope established under Supreme Court precedent. Plaintiff's interpretation of "enterprise" must be rejected because it would require exactly such an extension, allowing any Plaintiff to transform allegations of a pattern of, for instance, mail fraud into allegations of RICO violations merely through creative pleading.

All a plaintiff would have to do is allege facts sufficient to establish a pattern of mail fraud, then proceed to allege the existence of an "associated-in-fact enterprise" consisting of "the defendant and the Postal Service." This could be achieved simply by explaining their "(A) a common purpose, (B) a structure or organization, and (C) longevity necessary to accomplish the purpose." Eclectic Properties E., LLC v. Marcus & Millichap Co., 751 F.3d 990, 997 (9th Cir. 2014).

The "common purpose" would be "effectuating the delivery of the defendant's mail to its intended recipients." The "structure or organization" would be the procedures and relationships that allow the defendant to purchase stamps, properly address envelopes, and drop off envelopes for delivery by the Postal Service. Finally, the "longevity" would be the period of time during which the defendant and the Postal Service both act to effectuate the delivery of the defendant's mail. Finally, the defendant "conducts" the enterprise by writing addresses on the front of envelopes in order to direct the Postal Service's delivery of the mail.

Plaintiff in this case does not rely on the Postal Service to allege an associated-in-fact enterprise, relying instead on Defendant's utilization of other third-party services. But there is nothing in Plaintiff's theory of RICO liability that would distinguish between the two associated-in-fact "enterprises." Crediting Plaintiff's argument would not only render Plaintiff's allegations sufficient, it would also render sufficient the Postal Service allegations described above. Because the allegations described above are merely those necessary to establish a pattern of mail fraud (along with some creative elaboration), any interpretation of RICO that would treat such allegations as sufficient would necessarily expand RICO beyond the scope intended by Congress. Accordingly, Plaintiff's argument proves far too much and must be rejected.

**D.     Courts have overwhelmingly rejected attempts to characterize routine commercial relationships as RICO enterprises.**

In light of the numerous problems discussed above that would attend acceptance of arguments like Plaintiff's, it is unsurprising that very few Courts have been willing to follow Friedman and treat allegations of routine commercial relationships as sufficient to support a RICO claim. See Robins v. Global Fitness Holdings, LLC, 838 F. Supp. 2d 631, 652-53 (N.D. Ohio 2012) (rejecting Friedman as an outlier and citing multiple cases to the contrary); id. at 653 ("Because it is undisputed that the payment processors provided ordinary wire transfers to [Defendant], ignorant of any fraudulent scheme, Plaintiffs cannot establish they were members along with [Defendant] of an associated-in-fact enterprise under RICO."); Jubelirer v. MasterCard Int'l, Inc., 68 F. Supp. 2d 1049, 1053 (W.D. Wis. 1999) ("An enterprise must be more than a routine contractual combination for the provision of financial services."); see also Crichton v. Golden Rule Ins. Co., 576 F.3d 392, 400 (7th Cir. 2009) (internal citations omitted):

> Here, [Plaintiff] has done no more than describe the ordinary operation of a garden-variety marketing arrangement between Golden Rule and the Federation. His allegations of the Federation's role suggest it was merely a conduit for the sale of Golden Rule's insurance. This is not what RICO penalizes. What [Plaintiff] alleges here is a fraud perpetrated by Golden Rule, not an association-in-fact enterprise directed and controlled by Golden Rule. That is, [Plaintiff's] claim 'begins and ends' with the fraud allegedly committed by Golden Rule. This is insufficient to state a RICO claim based on an association-in-fact enterprise.

Despite the widespread consensus among courts that such routine business relationships are insufficient to impose RICO liability, there has been very little agreement among courts as to which particular RICO requirement fails under such circumstances. Indeed, courts have followed a surprisingly wide variety of approaches in reaching the same conclusion. Some of the various approaches adopted by courts are discussed briefly below.

Many courts have found the "common purpose" element unmet by requiring that the common purpose of an association be fraudulent in order for it to constitute a RICO enterprise. "For example, the Second Circuit requires a common fraudulent purpose in order to allege a RICO enterprise." Robins, 838 F. Supp. 2d at 652 (citing First Capital Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 174 (2d Cir. 2004)). Thus, under this approach, when a business provides services to its client, wholly ignorant of the client's fraudulent business practices, no enterprise is formed between the two businesses, due to the lack of common fraudulent purpose.

However, in the Ninth Circuit, "the law is unsettled as to whether the common purpose must be fraudulent." Chagby v. Target Corp., No. CV 08-4425-GKH(PJWX), 2008 WL 5686105, at *2 (C.D. Cal. Oct. 27, 2008) aff'd, 358 F. App'x 805 (9th Cir. 2009). In Odom v. Microsoft Corp., 486 F.3d 541, 543 (9th Cir. 2007) (en banc), the Ninth Circuit found a common fraudulent purpose sufficient to establish RICO liability. Odom, 486 F.3d at 552 (finding an associated-in-fact enterprise where "Microsoft and Best Buy had a common purpose of increasing the number of people using Microsoft's Internet service through fraudulent means.") (emphasis added). However, the Odom Court did not expressly state whether the fraudulent aspect of the common

purpose was critical to its holding. In addition to the common fraudulent purpose, the Court also noted the extensive nature of the relationship between the two companies:

> [The relationship between Microsoft and Best Buy] is "a comprehensive strategic alliance that encompasses broadband, narrowband, in-store and online efforts"; "provides for significant joint marketing in Best Buy's retail stores, online and through print/broadcast vehicles, profit sharing, the promotion of BestBuy.com to the 40 million users throughout Microsoft's properties, and technology assistance"; and pursuant to which "MSN® Internet access and Microsoft's full range of connectivity solutions will be demonstrated and sold at the more than 350 Best Buy stores in the U.S. and through BestBuy.com," and "Best Buy and BestBuy.com will receive prominent and preferred placement across Microsoft Properties, including MSNBC, and the Expedia.com® travel service, Hotmail® Web-based e-mail service, WebTV Network®, and the newly launched MSN eShop online shopping service."

> Odom, 486 F.3d at 545.

It is possible that the extensive ties between Microsoft and Best Buy would have been sufficient even if one of the companies lacked the mens rea necessary for fraud. The Court need not resolve this open question, however. Even among courts that haven't required the common purpose to be fraudulent, several courts have still found this element unmet when the alleged association-in-fact is merely a routine contract for services, because the entities are actually pursuing their individual economic interests, rather than any shared purpose. See, e.g., In re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig., No. 2:11-CV-07166-MRP, 2012 WL 10731957, at *8 (C.D. Cal. June 29, 2012) ("[F]rom the face of the AC [Amended Complaint] it appears that each of the non-parties identified by [Plaintiff] entered into a business relationship for their own commercial reasons. Even if . . . the non-parties' actions assisted [Defendant] . . . the AC makes clear that the assistance was in response to each entity's own business incentives. Parties that enter commercial relationships 'for their own gain or benefit' do not constitute an 'enterprise.'"); id. at *9 ("At the risk of being glib, [Plaintiff's] allegation amounts to one that '[Defendant] offered to buy something, and the [third parties] obliged.' [Plaintiff] has identified exactly the type of arms-length business transaction, with each party pursuing its own independent economic interests, that does not constitute a RICO enterprise."); Chagby, supra, at *2, *3 (concluding that "Plaintiff has failed to allege any common purpose between Defendant and its advertising agency, fraudulent or otherwise" because "Plaintiff alleges no facts that could lead someone to believe that Defendants' relationship with its advertising agency was anything more than a typical client of the advertising agency."); cf. Rosner v. Bank of China, 528 F. Supp. 2d 419, 428-29 (S.D.N.Y. 2007) ("The fact that BoC provided general professional services to IFS and Siu Lap, services that BoC provides to the public at large, does not provide a basis for inferring that BoC, IFS, and Siu Lap shared a common unlawful purpose . . . .").

Some Courts, rather than relying on the lack of a "common purpose," have noted the lack of organization and structure underlying a routine contractual relationship for the provision of services. See, e.g., Chagby, supra, at *3 ("An enterprise, as alleged by Plaintiff, between Defendants and their advertising agency, organized, existing, and maintained throughout by

Defendants themselves, is by definition not an ongoing organization between two distinct entities."); Crichton, 576 F.3d at 400 (concluding that Plaintiff failed to plead adequate organizational structure because Plaintiff's "allegations describe nothing more than the terms of an agreement between Golden Rule and the Federation to market Golden Rule's health insurance to the Federation's members."); VanDenBroeck v. CommonPoint Mortgage Co., 210 F.3d 696, 700 (6th Cir. 2000) (abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639 (2008)) (finding insufficient organization and structure where the allegations "seem[] to indicate nothing more than that CommonPoint had a business relationship with the secondary lenders. . . . [T]he enterprise alleged to exist in this case is too unstable and fluid an entity to constitute a RICO enterprise."); Rosner, 528 F. Supp. 2d at 428-29 ("[Plaintiff] states in conclusory fashion that BoC, IFS, and Siu Lap were an enterprise. The only factual allegation supporting this claim is that BoC provided 'indispensable banking services' to IFS and Siu Lap. . . . [T]he Corrected Complaint offers no facts relating to . . . the organization or hierarchy of the alleged enterprise."); Jubelirer, 68 F. Supp. 2d at 1052 (finding no organization or structure because the alleged enterprise "is nothing more than a simple contract for services of a type entered by millions of others").

Similarly, some courts have cited language from the Supreme Court's decision in Turkette, requiring "that the various associates function as a continuing unit." United States v. Turkette, 452 U.S. 576, 583 (1981). This approach asks whether the association is cohesive enough to treat it as a single entity independent of its members. See, e.g., Rosner, 528 F. Supp. at 428-29 ("[Plaintiff] states in conclusory fashion that BoC, IFS, and Siu Lap were an enterprise. The only factual allegation supporting this claim is that BoC provided 'indispensable banking services' to IFS and Siu Lap. . . . [T]he Corrected Complaint offers no facts relating to how BoC improperly functioned as a unit with IFS and Siu Lap."); VanDenBroeck, 210 F.3d at 700 (finding no enterprise because the complaint "seems to indicate nothing more than that CommonPoint had a business relationship with the secondary lenders. It does not allege or show that they 'function[ed] as a continuous unit.'"); Javitch v. Capwill, 284 F. Supp. 2d 848, 857 (N.D. Ohio 2003) ("An association based upon a business relationship does not constitute an enterprise under § 1962(c) as the enterprise must have an existence apart from its predicate acts in order to establish that the enterprise functioned as a continuing unit.").

Other courts have treated business relationships as associated-in-fact enterprises, but have concluded that other RICO requirements are lacking. For instance, at least one court has concluded that an enterprise formed by a routine business relationship is not "conducted" by the parties to the relationship. See, e.g., In re WellPoint, Inc. Out-of-Network UCR Rates Litig., 865 F. Supp. 2d 1002, 1034-35 (C.D. Cal. 2011) (finding the existence of an associated-in-fact enterprise based on a business relationship, but concluding that "the existence of a business relationship . . . without more does not show that [Defendant] conducted the enterprise.").

Other courts have noted that, even when an enterprise exists, it must be sufficiently distinct from the defendant as to have its own affairs independent of the defendant's affairs. Such courts have found that a routine contractual relationship between two parties is not sufficiently distinct from the contracting parties themselves. See, e.g., Crichton, 576 F.3d at 399 (finding a routine business relationship insufficient to establish a RICO enterprise because "an association-in-fact enterprise must be meaningfully distinct from the entities that comprise it such that the entity sought to be held liable can be said to have controlled and conducted the enterprise rather than

merely its own affairs."); cf. Chagby, supra, at *2, n.1 (because an association in fact must be distinct from its individual members, "Plaintiff cannot plead an enterprise as Defendant and its advertising agency, and then treat the enterprise as wholly under the control of Defendant, and not separate and apart from Defendant."); Whelan v. Winchester Prod. Co., 319 F.3d 225, 229 (5th Cir. 2003) ("That officers or employees of a corporation, in the course of their employment, associate to commit predicate acts does not establish an association-in-fact enterprise distinct from the corporation."); Elliott v. Foufas, 867 F.2d 877, 881 (5th Cir. 1989) ("If the defendant is a legal entity, the plaintiffs must do more than merely establish that the corporation, through its agents, committed the predicate acts in the conduct of its own business.").

Despite the wide variety of approaches adopted by courts in interpreting the requirements of RICO, there has been a remarkable uniformity in their conclusion that RICO liability must be predicated on a relationship more substantial than a routine contract between a service provider and its client. See, e.g., In re Countrywide, supra, at *10 (relationship between lender and underwriter "is the type of bilateral conduct that does not constitute a RICO enterprise. Every securities issue has an underwriter; if a claim of underwriter complicity were sufficient, then every securities claim could be recast as a RICO claim."); Jubelirer, 68 F. Supp. 2d at 1053 ("Accepting plaintiff's allegations as sufficient to allege a RICO enterprise would lead to the absurd conclusion that each of the many million combinations of merchant, MasterCard and lender is a RICO enterprise."); In re Jamster Mktg. Litig., No. 05CV0819 JM (CAB), 2009 WL 1456632, at *5 (S.D. Cal. May 22, 2009) (finding RICO claims not adequately pleaded because, after Plaintiff's legal conclusions were set aside, all that remained was "conduct consistent with ordinary business conduct and an ordinary business purpose.").

The Court need not choose among the numerous valid bases described above for finding Plaintiff's allegations deficient. The consensus among courts reflects the judgment that the statutory requirements of RICO "cannot be circumvented by attempting to characterize a routine contractual relationship for services as an independent enterprise." Jubelirer, 68 F. Supp. 2d at 1053. Allowing such circumvention would not only expand RICO beyond Congress's intent, it would also undermine the integrity of the judicial system by making liability depend on counsel's artful pleading practices, rather than the actual circumstances giving rise to litigation. Accordingly, the Court finds Plaintiff's RICO claim deficient as a matter of law.

## V.      CONCLUSION

The substantive requirements for RICO liability cannot be circumvented through sophistic pleading practices. Because Plaintiff's enterprise allegations constitute exactly such an attempt, Plaintiff's RICO claim must be dismissed for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).

Plaintiff's remaining causes of action all arise under state law. (See FAC at 56, 60, 62.) Because there is no diversity between the parties, (see FAC ¶¶ 14-15), the Court's sole basis for jurisdiction over Plaintiff's state law claims was supplemental jurisdiction under 28 U.S.C. § 1367(a), (see FAC ¶ 16). A district court may decline to exercise supplemental jurisdiction over a claim if the district court has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3). Plaintiff has identified no reason why the Court should exercise jurisdiction over her state law claims after dismissal of her federal claims. Accordingly, the Court declines to

exercise supplemental jurisdiction over Plaintiff's state law claims. Plaintiff's complaint is therefore dismissed.

**IT IS SO ORDERED.**